**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION**

MARJORIE CORNWELL MCREE,
EMORY CORNWELL WEBB,
*Individually and as Executor of the Estate of
Sue Rawls Cornwell*,
LINDA CORNWELL TURPIN,
*Individually and as Trustee of the Woodie C.
Cornwell Marital and Residuary Trusts*,
CLAIRE CORNWELL-WILLIAMS,
*Individually and as Trustee of the Woodie C.
Cornwell Marital and Residuary Trusts*,
MARK W. ISRAEL,
CHARLES L. ISRAEL,
HAROLD J. ISRAEL, JR.,
HENRY S. TEAFORD, JR.,
MARY BETH POWELL ROGERS,
JENNY CRISP,
J CRISP ENTERPRISES, LLC,
MARY LINDA COTTEN,
VERDURA LAND & TIMBER CO., and,
FLINT RIVERKEEPER, INC.,

        Plaintiffs,

   v.

LEATHERBROOK HOLSTEINS, LLC,
LEATHERBROOK HOLSTEINS #3, LLC,
ADAM L. GRAFT,

        Defendants.

**CIVIL ACTION NO.:**

**TRIAL BY JURY DEMANDED**

## COMPLAINT FOR CIVIL PENALTIES, INJUNCTIVE RELIEF, DAMAGES, AND ATTORNEYS' FEES AND EXPENSES OF LITIGATION

1.     Plaintiffs, lifelong Sumter County farmers, residents, and/or landowners Marjorie Cornwell McRee, Emory Cornwell Webb (individually and as Executor of the Estate of Sue Rawls Cornwell), Linda Cornwell Turpin (individually and as Trustee of the Woodie C. Cornwell Marital and Residuary Trusts), Claire Cornwell Williams (individually and as Trustee of the Woodie C. Cornwell Marital and Residuary Trusts), Mark W. Israel, Charles L. Israel, Harold J. Israel, Jr., Jenny Crisp, J Crisp Enterprises, LLC, Dr. Henry S. Teaford, Jr., Mary Beth Powell Rogers, Mary Linda Cotten, Verdura Land & Timber Co. (collectively, "Local Farmer Plaintiffs"), and nonprofit organization Flint Riverkeeper, Inc. (individually and on behalf of its members), bring this citizen suit under the Federal Water Pollution Control Act ("Clean Water Act" or "CWA"), 33 U.S.C. § 1365(a), against Defendants Leatherbrook Holsteins, LLC, Leatherbrook Holsteins #3, LLC, and Adam L. Graft, for past and ongoing discharges of manure, wastewater, silage waste/exudate, dredged and fill material, and other pollutants, from a large dairy operation with more than 12,000 dairy cows in Sumter County, Georgia, into local streams and wetlands, including Bear Branch a/k/a Oaheathla Creek, Muckalee Creek, and Muckaloochee Creek, without coverage under and/or in violation of the terms and limitations of an National Pollutant Discharge Elimination System ("NPDES") permit and/or a permit issued by the U.S. Army Corps of Engineers, in violation of Sections 301, 402, and 404 of the CWA.

2.     The Local Farmer Plaintiffs also bring state law claims of negligence per se, negligence, violation of riparian rights, trespass, nuisance, punitive damages, and attorneys' fees and expenses of litigation against Defendants for damage to and interference with their use and enjoyment of their farms and properties from the operations of Leatherbrook Holsteins, including from water pollution, noxious malodors, and destruction of wetlands and highly erodible land.

## BACKGROUND

I.    **Leatherbrook Holsteins.**

**Fig. 1: Leatherbrook Holsteins' Waste Lagoons (Facing U.S. 19/Northwest)**



3.      Defendants Leatherbrook Holsteins, LLC and Leatherbrook Holsteins #3, LLC are Florida limited liability companies.

4.      Defendant Adam L. Graft is the Managing Member of Defendants Leatherbrook Holsteins, LLC and Leatherbrook Holsteins #3, LLC.

5.      Defendant Adam L. Graft resides at 2620 South Lee Street, Americus, Georgia.

6.      Defendants Leatherbrook Holsteins, LLC, Leatherbrook Holsteins #3, LLC, and Adam L. Graft own and/or operate a dairy operation with more than 12,000 cows located near the intersection of U.S. 19 and Bear Branch Road in Sumter County ("Leatherbrook Holsteins").

7.      Defendants Leatherbrook Holsteins, LLC, Leatherbrook Holsteins #3, LLC, and Adam Graft are the alter egos, business conduits, and joint venturers of one or more Defendants.

8.      The average dairy farm in Georgia has a few hundred cows in confinement.

9.      Around 2008, Defendant Adam L. Graft acquired the dairy at issue from Mr. Charles Lamar Anthony and/or Mr. Jerry Wayne Anthony.

10.     Around 2008, Mr. Anthony had only about 1,000 mature cows in confinement.

11.     According to its latest annual report, Leatherbrook Holsteins has more than 12,400 cows (6,900 mature cows and 5,500 other cows) (about 14,750 animal units ("AU")).

12.     An animal unit ("AU") is a unit of measurement of the amount of waste generated by an animal feeding operation.  One mature dairy cow is equal to about 1.4 AU.

13.     On average, 6,900 mature dairy cows and 5,500 dairy heifers produce about as much waste per day as at least 350,000 people.  By comparison, the population of Columbus is about 200,000 people and the population of Albany is about 75,000 people.

14.     According to plans submitted to the State of Georgia, Leatherbrook Holsteins may have more than 15,000 cows.

**Fig. 1: Avg. Daily Waste from Leatherbrook Holsteins in Equivalent Human Population**



15.     Sumter County Parcel No. 16035713 is about 147 acres and contains at least 12 large confinement barns and three large manure/wastewater lagoons.

16.     Defendant Leatherbrook Holsteins #3, LLC owned Parcel No. 16035713 from approximately 2012 to December 2017.

17.     Around December 2017, Defendant Leatherbrook Holsteins, LLC, acquired Parcel No. 16035713 from Defendant Leatherbrook Holsteins #3, LLC.

18.     Since 2012, Defendant Leatherbrook Holsteins #3, LLC, has received at least $17.5 million ($17,500,000) in loans from Southwest Georgia Farm Credit ACA for its operations of Leatherbrook Holsteins.

19.     Since 2016, Defendant Leatherbrook Holsteins, LLC, has received at least $3.86 million ($3,860,000) in loans from Southwest Georgia Farm Credit ACA for its operations of Leatherbrook Holsteins.

20.     A good deal of these loans have been used to purchase large amounts of land (more than 6,000 acres) near and adjacent to Local Farmer Plaintiffs' farms and residences.

21.     Since 2012, Defendant Leatherbrook Holsteins #3, LLC, has owned most of the land that comprises the operations of Leatherbrook Holsteins.

22.     Defendants have cleared and/or converted much of this acquired land to pens, feedlots, and/or manure application areas for the operations of Leatherbrook Holsteins.

23.     As alleged in greater detail below, during this land clearing and/or conversion Defendants discharged dredged and fill material into Bear Branch and tributaries of Muckaloochee Creek without a CWA Section 404 permit.

24.     As alleged in greater detail below, during this land clearing and/or conversion Defendants converted wetlands and highly erodible land into pivots/manure application areas.

25.     According to the Georgia Environmental Protection Division ("EPD"),

Leatherbrook Holsteins is in an area of "high susceptibility" to groundwater pollution and "most

significant groundwater recharge" in the Claiborne aquifer.

**Fig. 3: Land Area Leatherbrook Holsteins (Yellow) v. City of Americus (Purple)**



## II.     The Local Farmer Plaintiffs.

26.     Plaintiffs are lifelong farmers, residents, and/or landowners of Sumter County.

27.     Plaintiffs use, enjoy, and rely on local streams and wetlands, including Bear

Branch, Muckalee Creek, and Muckaloochee Creek, for farming, irrigation, and aesthetic and

recreational enjoyment, including wading, swimming, fishing, hunting, hiking, camping, and

family gatherings.

6

28.     The Cornwell Plaintiffs include Plaintiffs Emory Cornwell Webb, Linda Cornwell Turpin, Claire Cornwell-Williams, and Marjorie Cornwell McRee.

29.     Plaintiffs Linda Cornwell Turpin, Claire Cornwell Williams, and Marjorie Cornwell McRee are the daughters of the late Mr. and Mrs. Woodie C. and Sue Rawls Cornwell.

30.     Plaintiff Emory Cornwell Webb is the son of Plaintiff Marjorie Cornwell McRee and the Executor of the Estate of Sue Rawls Cornwell.

31.     Plaintiff Emory Cornwell Webb owns, farms, and resides with his children at an approximately 316-acre farm located at 1210 Sam Rodgers Road, Smithville, GA 31787.

32.     Plaintiff Emory Cornwell Webb's residence is riparian to Muckaloochee Creek and is next to some of Leatherbrook Holsteins' cow pens and manure application fields.

33.     Plaintiff Emory Cornwell Webb also owns and farms several hundred other acres near Leatherbrook Holsteins including several other parcels riparian to Muckaloochee Creek and parcels within the Webb Family Farm National Historic Register District.

34.     Plaintiffs Linda Cornwell Turpin and Claire Cornwell Williams are Trustees of the Woodie C. Cornwell Marital and Residuary Trusts.

35.     The Cornwell Plaintiffs, the Estate of Sue Rawls Cornwell, and/or the Woodie C. Cornwell Marital and Residuary Trusts collectively own and/or control an approximately 1,475-acre farm ("Cornwell Farm") adjacent to and downstream of portions of Leatherbrook Holsteins in the historic farming community of Sumter.

36.     Plaintiff Marjorie Cornwell McRee operates the Cornwell Farm for a living.

37.     The Cornwell Farm includes parcels that are adjacent to and downstream of Leatherbrook Holsteins and riparian to Bear Branch and Muckalee Creek.

38.     The Cornwell Farm includes a residence at 304 Cornwell Road that the Cornwell Plaintiffs and their family members frequently use and enjoy including for family gatherings.

39.     The Cornwell Plaintiffs and their family members use and enjoy the Cornwell Farm, including portions of Bear Branch and/or Muckalee Creek on the Cornwell Farm, for aesthetic and recreational enjoyment, including wading, swimming, fishing, hunting, hiking, camping, and family gatherings.

40.     Plaintiffs Mark W. Israel, Charles L. Israel, and Harold J. Israel, Jr., are the sons of Harold Israel.  The Israel family has farmed in Sumter County for more than 100 years.

41.     Plaintiff Mark W. Israel owns, farms, and resides with his family at an approximately 500-acre farm located at 607 Croxton Cross Road, Smithville, GA 31787.

42.     Plaintiff Mark W. Israel's residence is riparian to a tributary of Muckaloochee Creek and is adjacent to and downstream of portions of Leatherbrook Holsteins.

43.     Plaintiff Charles L. Israel owns, farms, and resides with his family at an approximately 200-acre farm located at 284 Croxton Cross Road, Smithville, GA 31787. Plaintiff Charles L. Israel owns this farm with his brother Plaintiff Harold J. Israel, Jr.

44.     This farm and Plaintiff Charles L. Israel's residence is riparian to Muckaloochee Creek and is downstream of portions of Leatherbrook Holsteins.

45.     Plaintiffs Mark W. Israel, Charles L. Israel, and Harold J. Israel, Jr. also own and/or farm several hundred other acres downstream of Leatherbrook Holsteins including several other parcels riparian to Muckaloochee Creek.

46.     Plaintiff Jenny Crisp is a managing member of Plaintiff J Crisp Enterprises, LLC and operates the Crisp Farm.

47.     Plaintiff J Crisp Enterprises, LLC owns Parcel 16071283, an approximately 585-acre farm ("Crisp Farm") that is riparian to Bear Branch and/or Muckalee Creek and downstream of portions of Leatherbrook Holsteins.

48.     Plaintiff Dr. Henry S. Teaford, Jr. owns Parcel 16061251, a 350-acre farm that is riparian to Muckalee Creek and across from the waste lagoon area of Leatherbrook Holsteins.

49.     Plaintiff Mary Beth Powell Rogers owns Parcel 160612510, a 150-acre farm that is riparian to Muckalee Creek and across from the waste lagoon area of Leatherbrook Holsteins.

50.     Plaintiffs including the Cornwell Plaintiffs, Jenny Crisp, J Crisp Enterprises, LLC, Dr. Henry S. Teaford, Jr., and/or Mary Beth Powell Rogers have relied on and/or continue to rely on water from portions of Bear Branch, Muckalee Creek, and/or Muckaloochee Creek downstream of Leatherbrook Holsteins to irrigate crops and vegetables on their farms.

51.     Plaintiff Mary Linda Cotten is the CEO of Plaintiff Verdura Land & Timber Co.

52.     Plaintiff Verdura Land & Timber Co. owns an approximately 775-acre farm ("Cotten Farm") adjacent to and downstream of portions of Leatherbrook Holsteins.

53.     The Cotten Farm is riparian to portions of Muckalee Creek and adjacent to and downstream of portions of Leatherbrook Holsteins.

54.     Plaintiff Mary Linda Cotten's sons reside on the Cotten Farm.

55.     The Cotten Family uses and enjoys the Cotten Farm, including portions of Muckalee Creek the farm, for family gatherings and aesthetic and recreational enjoyment, including wading, swimming, fishing, hunting, hiking, camping, and family gatherings.

56.     Plaintiff Flint Riverkeeper, Inc. is a local 501(c)(3) nonprofit corporation with a principal office in Albany, Georgia.

57.     The purpose of Flint Riverkeeper is to "restore and preserve the habitat, water quality and flow of the Flint River watershed [which includes Bear Branch, Muckalee Creek, and Muckaloochee Creek] for the benefit of the general public, including [Flint Riverkeeper's] members, and future generations and dependent wildlife in the Flint River watershed."

58.     Flint Riverkeeper has around 900 members consisting of farms, families, and businesses.  These members include several of the Local Farmer Plaintiffs.

59.     Members of Flint Riverkeeper use, enjoy, and rely on Bear Branch, Muckalee Creek, and Muckaloochee Creek, for farming, irrigation, aesthetic, and recreational enjoyment, including wading, swimming, fishing, hunting, hiking, camping, and family gatherings.

**Fig 4: Streams (Green), Leatherbrook (Yellow), Plaintiffs' Downstream Farms (Purple)**



### III.     Pre-Suit Notice Letter

60.     On May 8, 2019, Plaintiffs sent Defendants a Notice of Intent to Sue under the Clean Water Act and Resource Conservation and Recovery Act ("Notice Letter").

61.     Plaintiffs attach and incorporate by reference the allegations in the Notice Letter.

62.     This Notice Letter notified Defendants of the CWA violations alleged below and Plaintiffs' intent to file a citizen suit after 60 days should the violations continue.

63.     As alleged in more detail below, Defendants have failed to cease their violations of the CWA, and these violations are currently continuous and/or reasonably likely to recur.

64.     Neither the Georgia EPD nor the U.S. Environmental Protection Agency ("EPA") is prosecuting a pending civil or criminal action to redress the violations alleged herein.

65.     This Court has exclusive jurisdiction over this case under § 505(a) of the Clean Water Act.  33 U.S.C. § 1365(a).

66.     Plaintiffs' Notice Letter also notified Defendants of violations of the Resource Conservation and Recovery Act ("RCRA") and Plaintiffs' intent to file a citizen suit under RCRA after 90 days should the violations continue.  Plaintiffs may amend their complaint to add claims under RCRA at an appropriate time.

## STATUTORY AND REGULATORY BACKGROUND

### I.     The Clean Water Act.

67.      The primary objective of the Clean Water Act is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).

68.     Another objective of the CWA is to ensure that citizens can fish, swim, and recreate in all the Nation's waters.  33 U.S.C. § 1251(a)(2).

69.     To achieve these objectives, § 301(a) of the CWA prohibits the "discharge of pollutants" by any "person" from "point sources" into "waters of the United States."

70.     "Pollutants" means "dredged spoil, solid waste . . . sewage, garbage, sewage sludge . . . chemical wastes . . . biological materials . . . rock, sand, cellar dirt and industrial, municipal, **and agricultural waste** discharged into water."  33 U.S.C. § 1362(6) (emphasis added).

71.     Section 402 of the CWA establishes the National Pollutant Discharge Elimination System ("NPDES") permitting program, which prohibits the discharge of pollutants from "point sources" into "waters of the United States" without an NPDES permit or in violation of the limitations of an NPDES permit.  33 U.S.C. § 1342.

72.     Section 502(14) of the CWA defines "point source" as "any discernable, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure [or] **concentrated animal feeding operation ["CAFO"]** . . . from which pollutants are or may be discharged."  33 U.S.C. § 1362(14) (emphasis added).

73.     Under § 402(b) of the CWA, U.S. EPA has delegated to Georgia EPD the authority to issue NPDES permits in the State of Georgia under the Georgia Water Quality Control Act ("GWQCA").

**II.     Regulation of AFOs and CAFOs under the Clean Water Act.**

74.     An "animal feeding operation" ("AFO") means a "lot or facility" where "animals . . . have been, are, or will be stabled or confined and fed or maintained for a total of 45 days or more in any 12-month period, and crops, vegetation, forage growth, or post-harvest residues are not sustained in the normal growing season over any portion of the lot or facility."  40 C.F.R. § 123.23(b).

75.     Incidental vegetation in an area of confinement such as a pen or feedlot does not exclude the area from being an AFO or CAFO.  68 Fed. Reg. 7,176, 7,189 (Feb. 12, 2003).

76.     An AFO is a "large CAFO" if it confines at least "700 mature dairy cows, whether milked or dry" or "1,000 cattle other than mature dairy cows [including] heifers, steers, bulls, and cow/calf pairs."  40 C.F.R. §122.23(b)(4).

77.     An AFO is a "medium CAFO" if it confines at least "300 cattle other than mature dairy cows" including "heifers, steers, bulls and cow/calf pairs."  40 C.F.R. §122.23(b)(6).

78.     CAFOs are "point sources, subject to NPDES permitting requirements."  40 C.F.R. § 123.23(a).

79.     "Once an animal feeding operation is defined as a CAFO for at least one type of animal, the NPDES requirements for CAFOs apply with respect to all animals in confinement at the operation and all manure, litter, and process wastewater generated by those animals or the production of those animals, regardless of the type of animal."  40 C.F.R. § 122.23(a).

80.     "Land application area" means "land under the control of an AFO owner or operator, whether it is owned, rented, or leased, to which manure, litter or process wastewater from the production area is or may be applied."  40 C.F.R. § 122.23(b)(3).

81.     "Production area" means "that part of an AFO that includes the animal confinement area, the manure storage area, the raw materials storage area, and the waste containment areas."  40 C.F.R. § 122.23(b)(8).

## III.     NPDES Permit Requirement for CAFOs.

82.     "A CAFO must not discharge unless the discharge is authorized by an NPDES permit.  In order to obtain authorization under an NPDES permit, the CAFO owner or operator must either apply for an individual NPDES permit or submit a notice of intent for coverage under an NPDES general permit."  40 C.F.R. § 122.23(d)(1).

83.     "Process wastewater" includes any water that comes into contact with litter, manure, bedding, and silage waste/exudate.  *See* 40 C.F.R. § 122.23(b)(7).

84.     "The discharge of manure, litter or process wastewater to waters of the United States from a CAFO as a result of the application of that manure, litter, or process wastewater by the CAFO to land areas under its control is a discharge from that CAFO subject to NPDES permit requirements, except where it is an agricultural stormwater discharge."  40 C.F.R. § 122.23(e).

85.     "For unpermitted large CAFOs, a precipitation-related discharge of manure, litter, or process wastewater from land areas under the control of a CAFO shall be considered an agricultural stormwater discharge only where the manure, litter, or process wastewater has been land applied in accordance with site-specific nutrient management practices that ensure appropriate agricultural utilization of the nutrients in the manure, litter, or process wastewater." 40 C.F.R. § 122.23(e)(1).

86.     The CWA and GWQCA prohibit dry weather discharges of manure and/or process wastewater from land areas under control of Defendants into waters of the United States by point sources such as pipes and channels no matter if the area is an AFO or CAFO or part of the operations of an AFO or CAFO.

87.     In Georgia, the Georgia EPD has issued NPDES CAFO General Permit GAG930000 ("General NPDES Permit").  Coverage under this permit is required for any AFO and CAFO that discharges to waters of the State.

88.     The General NPDES Permit is based on the effluent limitations at 40 C.F.R. §§ 122.42(e) & 412.

89.     A facility, however, cannot obtain coverage under the General NPDES Permit and must obtain an individual NPDES permit if its discharges contribute directly or indirectly to an impaired stream.

90.     Under the General NPDES Permit, "a discharge of wastewater is considered the discharge of pollutants from an animal confinement or storage and handling areas or from the improper use of land application area(s), under the control of the CAFO owner, which enters waters of the State."

91.     The General NPDES Permit and the federal regulations prohibit the discharge of pollutants in manure, litter, and process wastewater from the production area into waters of the United States unless precipitation causes an overflow of manure, litter, or process wastewater from the production area ***and*** the production area is properly designed, constructed, operated and maintained to contain all manure, litter, and process wastewater including the runoff and the direct precipitation from a 25-year, 24-hour rainfall event.

92.     The General NPDES Permit and the federal regulations prohibit the discharge of pollutants in manure and/or process wastewater from the land application areas to waters of the United States except from precipitation-related discharges where the manure and/or process wastewater have been land applied in accordance with a valid and current site-specific Nutrient Management Plan ("NMP") approved by Georgia EPD.

93.     Under the General NPDES Permit, the NMP must be developed **and implemented** to meet all the Minimum Standards and Best Management Practices ("BMPs") in the General NPDES Permit and 40 C.F.R. § 412.4, including:

        a.      No land application of manure and/or process wastewater except in accordance with proper agricultural practices;

        b.      No land application of manure and/or process wastewater except in accordance with land application rates that **at a minimum**: (i) prevent application of nutrients at rates that will exceed the capacity of the soil and the planned crops to assimilate nutrients and minimize water pollution, and (ii) be quantified and based on the

most appropriate nutrient in the soil, type of crop, realistic crop yields, soil type, and all nutrient inputs in addition to those from manure and wastewater;

        c.      No land application of manure and/or process wastewater on land that is saturated with water at the time of land application where the manure and/or process wastewater may enter waters of the State; and

        d.      No land application of manure and/or process wastewater during rainfall events and when precipitation with the potential to create manure and/or process wastewater runoff into waters of the State is forecast within 24 hours of the planned application.

94.      Georgia EPD requires an AFO that does not discharge to waters of the State to obtain coverage under General Land Application System ("LAS") Permit GAG940000 ("General LAS Permit").  The General LAS Permit is not a CWA NPDES permit.

95.      Under General LAS Permit, the permittee must submit an updated NMP for review and approval by EPD 180 days before modifying, increasing the number of animals, or adding any spray fields.

**IV.    Failure of EPA and EPD to Enforce CAFO Regulations in Georgia.**

96.      Georgia has the third most AFOs with more than 1,000 AUs in the United States.

97.      For at least the past decade, Georgia EPD has allowed the Georgia Department of Agriculture to review permit applications and approve NMPs for and conduct inspections of AFOs and CAFOs in Georgia.

98.      In 2011, the U.S. EPA Office of Inspector General ("IG") investigated a complaint that EPA was not adequately overseeing Georgia's CAFO program and issued a report that found "significant deficiencies in the Georgia [EPD's] management and [U.S. EPA] Region 4's oversight of the CAFO program [in Georgia]."

99.     The IG found that "CAFOs were operating without NPDES permits or Nutrient Management Plans, inspection reports were missing required components, and the Georgia Department of Agriculture was not assessing compliance with permit conditions."

100.    The IG stated that "there is a significant risk that Georgia's CAFO program is failing to protect water quality" particularly given that "the animals produce large quantities of waste—many times more waste than humans annually."

101.    As shown by this case, EPA and EPD continue to fail to oversee and enforce the CAFO program and regulations in Georgia.

102.    EPA and EPD's failure to enforce the CWA and the CAFO regulations is not a defense to Defendants' violations of the CWA and the CAFO regulations.

**V.      Unpermitted Discharges of Dredged or Fill Material.**

103.    Section 404 of the CWA prohibits the "discharge of dredged or fill material" into waters of the United States except in accordance with a permit issued by the U.S. Army Corps of Engineers ("Section 404 permit").  33 U.S.C. § 1344.

104.    Section 404(f)(1)(A) of the CWA creates a narrow exception to this prohibition for "the discharge of dredged or fill material from normal farming . . . activities such as plowing [and] minor drainage."  33 U.S.C. § 1344(f)(1)(A).

105.    To qualify as "normal farming activities," the activities "must be part of an established (i.e., ongoing) farming . . . operation and must be in accordance with definitions in § 323.4(a)(1)(iii)."  33 C.F.R. § 323.4(a)(1)(ii).

106.    "Activities that bring an area into farming . . . use are not part of an established operation."  33 C.F.R. § 323.4(a)(1)(ii).

107.    The term plowing "does not include the redistribution of soil, rock, sand, or other surficial materials in a manner which changes any area of the waters of the United States to dry land." 33 C.F.R. § 323.4(a)(1)(iii)(D).

108.    For example, "the redistribution of surface materials by blading, grading, or other means to fill in wetland areas is not plowing." 33 U.S.C. § 323.4(a)(1)(iii)(D).

109.    "Minor drainage" does "not include drainage associated with the immediate or gradual conversion of a wetland to a non-wetland . . . or conversion from one wetland use to another (for example, silviculture to farming)." 33 C.F.R. § 323.4(a)(1)(iii)(C)(2).

110.    In addition, "minor drainage" does "not include the construction of any canal, ditch, dike or other waterway or structure which drains or otherwise significantly modifies . . . any other wetland . . . constituting waters of the United States. *Id*.

111.    Any discharge of dredged or fill material into the waters of the United States incidental to the construction of any such structure or waterway requires a permit." *Id*.

112.    Where Section 404(f)(1) exempts a discharge from the permit requirement, it may still be subject to the permit requirement under the "recapture" provision of Section 404(f)(2).

113.    Section 404(f)(2) states that "any discharge of dredged or fill material into the navigable waters incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced, shall be required to have a permit under this section." 33 U.S.C. § 1344(f)(2).

114.    Under the "recapture" provision, "a permit will be required for . . . the conversion of a wetland from silvicultural to agricultural use when there is a discharge of dredged or fill material into waters of the United States in conjunction with construction of dikes, drainage ditches or other works or structures used to effect such conversion." 33 C.F.R. § 323.4(c).

## CLAIMS FOR RELIEF

115.    All Plaintiffs bring the First and Second Claims for Relief.  Only the Local

Farmer Plaintiffs bring the remaining claims for relief under state tort law.

116.    Defendants Leatherbrook Holsteins, LLC, Leatherbrook Holsteins #3, LLC,

and/or Adam L. Graft are derivatively liable for violations by one or more Defendants of the

CWA and state law alleged below because they are the alter egos, business conduits, and/or joint

venturers of one or more Defendants.

### FIRST CLAIM FOR RELIEF
**(Violations of Sections 301 and 402 of the Clean Water Act through Ongoing Discharges of
Pollutants Without or in Violation of a Valid NPDES Permit)**

117.    Plaintiffs incorporate by reference the factual allegations in the factual and

regulatory background sections above and the allegations in the Notice Letter.

118.    Bear Branch, Muckalee Creek, and Muckaloochee Creek, and the wetlands

adjacent to them are waters of the United States (hereinafter "waters at issue").

119.    Defendant Leatherbrook Holsteins #3, LLC is an owner and/or operator of

Leatherbrook Holsteins.

120.    Defendant Leatherbrook Holsteins, LLC is an owner and/or operator of

Leatherbrook Holsteins.

121.    Defendant Adam Graft is an owner and/or operator of Leatherbrook Holsteins.

122.    Leatherbrook Holsteins is a large CAFO.

123.    Since at least December 1, 2014, Defendants have not had any NPDES permit to

discharge pollutants from point sources into waters of the United States under the CWA.

124.    For the past five years, Defendants have not had and still do not have a valid,

current, or an EPD-approved Nutrient Management Plan ("NMP") for Leatherbrook Holsteins.

125.    From 2010 to October 2018, Defendants greatly increased the number of animals (from 3,000 to more than 12,000 cows) and the acreage of the land application areas (by hundreds of acres) at Leatherbrook Holsteins but did not submit an updated NMP for review and approval by EPD 180 days prior to such increases.

126.    In October 2018, Defendants submitted a revised NMP to the Georgia Department of Agriculture.

127.    Georgia EPD has yet to approve the revised October 2018 NMP.

128.    The October 2018 NMP does not meet the Minimum Standards and BMPs in 40 C.F.R. § 412.4, and it does not accurately reflect the operations of Leatherbrook Holsteins.

129.    The October 2018 NMP also does not cover or account for the large amounts of waste generated by hundreds to thousands of cows on various pens and/or feedlots at Leatherbrook Holsteins, including those identified in the Notice Letter ("pens/feedlots").

130.    The operations of the Leatherbrook Holsteins CAFO include several pens/feedlots including those identified in the Notice Letter.

131.    These pens/feedlots are medium to large AFOs.

132.    Leatherbrook Holsteins confines and feeds and/or maintains at least 300 and very likely more than 1,000 cows and/or heifers on these pens/feedlots for more than 45 days per year.

133.    Leatherbrook Holsteins does not grow crops or forage on these pens and/or feedlots, and the pens and/or feedlots contain only incidental vegetation with large barren areas and runoff channels and other point sources.

134.    The NPDES requirements also apply to these pens and/or feedlots because they are AFOs and also because they are part of the operations and production areas of Leatherbrook Holsteins, which is a large CAFO.

**Fig. 5: Leatherbrook Holsteins Feedlot and Eutrophication of Downstream Waters**



135.    For at least the past five years, Defendants have land applied manure, process wastewater, and/or commercial fertilizer to land application areas of Leatherbrook Holsteins in excess of agronomic rates, i.e., manure containing more nitrogen and/or phosphorus than the crops can and/or could use.

136.    For at least the past five years, Defendants have land applied manure and/or process wastewater to land application areas of Leatherbrook Holsteins using a constant "book value" of 680 pounds of organic nitrogen per acre and not site-specific nutrient management practices.

137.    The level of phosphorus in several land application areas of Leatherbrook Holsteins is greater than 200 pounds per acre, which is in excess of agronomic rates.

138.     Defendants have violated and continue to violate Sections 301 and 402 of the CWA because, from July 2014 to the present, during and as a result of Defendants' operation and/or ownership of Leatherbrook Holsteins, there have been and continue to be repeated:

a.      Dry weather discharges of manure, process wastewater, silage waste/exudate, and/or other pollutants from the CAFO to the waters at issue without and/or in violation of the terms of a valid NPDES permit.

b.      Dry weather discharges of manure, process wastewater, silage exudate, and/or other pollutants from pens, feedlots, production areas, and land application areas of Leatherbrook Holsteins to the waters at issue via pipes, drains, ditches, channels, and other point sources (including the point sources identified in the Notice Letter) without and/or in violation of the terms of a valid NPDES permit.

c.      Discharges of stormwater containing manure, process wastewater, silage exudate, and other pollutants from pens, feedlots, production areas, and other non-land application areas that are part of the operations of the Leatherbrook Holsteins CAFO to the waters at issue via pipes, drains, ditches, channels, and other point sources (including the point sources identified in the Notice Letter), during storm events less than a 25-year, 24-hour storm event, without and/or in violation of the terms of a valid NPDES permit.

d.      Discharges of stormwater containing manure, process wastewater, silage exudate, and/or other pollutants from land application areas of Leatherbrook Holsteins to the waters at issue, where the land application of manure, process wastewater, and/or commercial fertilizer was not in accordance with a valid, current, and approved NMP and/or site-specific nutrient management practices that ensure appropriate agricultural use of the nutrients in the manure and/or process wastewater, without and/or in violation of the terms of a valid NPDES permit.

139.    The dates and locations of the CWA violations alleged in the preceding paragraph including but are not limited to those specified in the Notice Letter.

140.    The "other pollutants" referred to in Paragraph 137 and this complaint include but are not limited to those drugs, viruses, pathogens, and chemicals specified in the Notice Letter.

141.    Defendants also have violated and continue to violate Sections 301 and 402 of the CWA because, from December 2014 to the present, during and as a result of Defendants' operation and/or ownership of Leatherbrook Holsteins:

      a.    They have failed to design, construct, maintain, and operate retention structures on pens, feedlots, silage storage areas, and other production areas to contain all manure and/or process wastewater and/or silage waste/exudate from the operations of Leatherbrook Holsteins and all runoff from a 25-year, 24-hour rainfall event; and

      b.    They have failed to develop and implement an NMP that meets all the BMPs and Minimum Standards in the General NPDES Permit and 40 C.F.R. § 412.4.

142.    The discharges and violations of the CWA alleged above have caused and/or contributed to pollution of Bear Branch, Muckalee Creek, and/or Muckaloochee Creek, including the portions of the waters at issue on Local Farmer Plaintiffs' farms, with the pollutants specified in the Notice Letter.  *See* Notice Letter at 3.

143.    The violations of the CWA alleged above have caused and/or contributed to violations of Georgia's water quality standards for E. coli, dissolved oxygen, and other parameters in the waters at issue including portions on Local Farmer Plaintiffs' farms.

144.    The violations of the CWA alleged above have caused and/or contributed to eutrophication (excessive levels of nutrients) in the waters at issue including the portions of the waters at issue on Local Farmer Plaintiffs' farms.

**Fig. 6: Recent Bear Branch E. Coli Data (CFU/100 ml) (3,600 ≈ Too Numerous to Count)**



145.    The repeated discharges and pollution of the waters at issue alleged above have caused Local Farmer Plaintiffs and members of Flint Riverkeeper to curtail their use of the waters at issue, including the portions of the waters at issue on their farms, for wading, swimming, fishing, hunting, hiking, camping, and other aesthetic and recreational enjoyment.

146.    The repeated discharges and pollution of the waters at issue alleged above have impaired and/or threatened the ability of Local Farmer Plaintiffs to use the portions of the waters at issue on their farms to irrigate crops because of the potential for contamination of the crops with the drugs, viruses, pathogens, and chemicals specified in the Notice Letter.

147.    The violations of the CWA alleged above have caused and/or contributed to elevated levels of nitrates and phosphorus in the groundwater on Local Farmer Plaintiffs' farms including levels of nitrates near and/or in excess of applicable MCLs.

## SECOND CLAIM FOR RELIEF
### (Ongoing Violations of Sections 301 and 404 of the Clean Water Act)

148.    Plaintiffs incorporate by reference the factual allegations in the factual and regulatory background sections above and the allegations in the Notice Letter.

149.    Upon information and belief, each Defendant violated and continues to violate Section 404 of the CWA because during their operation and/or ownership of Leatherbrook Holsteins each Defendant discharged dredged and/or fill material into the waters at issue without a Section 404 permit.

150.    The locations of these violations include those specified in the Notice Letter.  *See* Notice Letter at 10.

151.    These discharges of dredged and/or fill material by Defendants include the discharge of soil, rock, metal, concrete, and other structures into a portion of Bear Branch to build a road/embankment in Bear Branch within the past five years.

152.    These discharges of dredged and/or fill material by each Defendant also include the redistribution of surface materials by blading, grading, or other means to fill in wetlands and change them to dry land to bring them into farming use and construct new center pivots, including at the locations specified in the Notice Letter.

153.    These discharges of dredged and/or fill material by each Defendant also include the construction of canals, ditches, dikes, and other structures which continue to drain or otherwise significantly modify wetlands and tributaries of Bear Branch and Muckaloochee Creek, and continue to convert them from wetlands to non-wetlands and/or one from silviculture use to farming use, including at the locations specified in the Notice Letter, within the past five years.

**Fig. 7: Fill Material and Eutrophication of Bear Branch on Leatherbrook Holsteins**





154.    These violations of Section 404 are ongoing because the discharges continue to impair the flow and/or circulation and reduce the reach of the waters at issue.

155.    These violations of Section 404 are ongoing because the discharges continue to add and leach fill material, and manure, process wastewater, silage waste/exudate, and other pollutants, to the waters at issue.

156.    Each Defendant continues to add fill material to these areas through their ongoing addition and application of solid manure to these areas.

157.    Each Defendant continues to add fill material to these areas through continued blading and grading of these areas including the road/embankment in Bear Branch.

158.    These violations of the CWA have caused and/or contributed to the pollution and degradation of water quality of the waters at issue, including portions on Local Farmer Plaintiffs' farms.

159.    These violations of the CWA have also caused and/or contributed to the past and ongoing flooding of portions of Plaintiff Mark L. Israel's farm and residence.

160.    Because of the violations of the CWA alleged in the First and Second Claims for Relief, one or more Local Farmer Plaintiffs cannot use Bear Branch to irrigate their crops.

161.    The violations of the CWA alleged in the First and Second Claims for Relief have frustrated the mission of Flint Riverkeeper and caused Flint Riverkeeper to divert significant resources to monitoring and counteracting these violations.

162.    An order from the Court requiring Defendants to come into consistent and permanent compliance with the CWA would redress the injuries to Local Farmer Plaintiffs and Flint Riverkeeper alleged in the First and Second Claims for Relief.

**Fig. 8: Ditches/Structures on Leatherbrook Holsteins Draining Wetlands to Israel Property**





## THIRD CLAIM FOR RELIEF
### (Negligence Per Se)

163.    Plaintiffs incorporate the preceding factual allegations by reference.

**I.    Violations of the CWA.**

164.    Defendants have violated and continue to violate the CWA as alleged in the First and Second Claims for Relief, which allegations Plaintiffs incorporate by reference.

**II.    Violations of the LAS General Permit.**

165.    Defendants violated the LAS General Permit by discharging manure, process wastewater, and other pollutants from point sources to the waters at issue.

166.    Defendants violated the LAS General Permit by failing to submit an updated NMP no later than 180 days after obtaining coverage under the LAS General Permit.

167.    Defendants violated the LAS General Permit by failing to submit an updated NMP to Georgia EPD for review and approval 180 days before modifying, increasing the number of animals, and adding any spray fields.

168.    Defendants violated the LAS General Permit by applying manure and/or process wastewater to areas not identified in the 2010 NMP from at least 2010 through the present.

169.    Defendants violated the LAS General Permit by failing to amend, develop, and implement a site-specific NMP that includes all the elements and information required by the permit including a failure to establish protocols to land apply manure and/or process wastewater in accordance with site specific nutrient management practices that ensure appropriate agricultural use of the nutrients in the manure and/or process wastewater.

170.    Defendants violated the LAS General Permit by failing to ensure that the effective implementation of the NMP resulted in compliance with all permit conditions.

171.    Defendants violated the LAS General Permit by failing to report discharges of manure and/or process wastewater from feedlots and silage storage areas to the wasters at issue.

29

172.    Defendants violated the LAS General Permit by applying manure and/or process wastewater to sites that were flooded, when conditions were such that the applied wastewater would not be absorbed into the soil, and/or when it was raining and/or the soil was saturated.

173.    Defendants violated the LAS General Permit because the new and/or existing waste lagoons exceed a maximum contaminant level ("MCL") for drinking water and/or seepage from the new waste lagoons exceed the criteria in the permit.

174.    Defendants violated the LAS General Permit because the groundwater in the wells has exceeded the primary MCL for nitrate nitrogen in drinking water (10 mg/l).

175.    Defendants violated the LAS General Permit by not complying with all the reporting, monitoring, and record-keeping requirements in the LAS General Permit.

176.    Defendants violated the LAS General Permit by failing to take all reasonable steps to minimize or prevent any discharge in violation of the permit which has a reasonable likelihood of adversely affecting human health or the environment.

### III.    Violations of Wetland and Highly Erodible Land Conservation Regulations.

177.    From 2008 to the present, Defendant Leatherbrook Holsteins, LLC, has received more than $200,000 in farm subsidy payments from USDA.

178.    From 2008 to the present, Defendant Adam L. Graft has received more than $45,000 in farm subsidy payments from USDA.

179.    Upon information and belief, Defendants have failed to comply with the Wetland ("Swampbuster") and Highly Erodible Land ("Sodbuster") Conservation regulations of the Food Security Act by converting a wetland that made the production of an agricultural commodity possible and by planting or producing an agricultural commodity on a converted wetland and/or highly erodible land without having and/or following a conservation plan approved by the U.S. Natural Resources Conservation Service.

180.    The violations of the statutes and regulations by Defendants alleged above (the CWA, the LAS General Permit, and the wetland and highly erodible land conservation regulations) were intentional and/or the result of Defendants' failure to exercise ordinary care.

181.    Local Farmer Plaintiffs fall within the class of persons these statutes and regulations were intended to protect.

182.    Defendants breached duties owed to Local Farmer Plaintiffs through their violations of the statutes and regulations alleged above.

183.    Defendants' violations of the statutes and regulations above were the direct and proximate cause of damage to and pollution of Local Farmer Plaintiffs' farms in amounts to be proven at trial.

184.    The damage to and pollution of Local Farmer Plaintiffs' farms are the same damages that the statutes and regulations above were intended to guard against.

### FOURTH CLAIM FOR RELIEF
### (Negligence)

185.    Plaintiffs incorporate by reference all the preceding factual allegations.

186.    Defendants had a duty to operate Leatherbrook Holsteins with a degree of care exercised by ordinarily prudent persons under the same or similar circumstances and which every prudent man takes of his own property of a similar nature.  O.C.G.A. § 51-1-2.

187.    Defendants had a duty to use BMPs while operating Leatherbrook Holsteins.

188.    Defendants had a duty not to so pollute or adulterate the waters at issue as to interfere with the enjoyment of them by, or lessen their value to, the next owner.

189.    During each Defendant's operation and/or ownership of Leatherbrook Holsteins, each Defendant breached these duties alleged above owed to Plaintiffs.

190.    The breaches of these duties by each Defendant damaged and polluted Local Farmer Plaintiffs' farms in amounts to be proven at trial.

## FIFTH CLAIM FOR RELIEF
### (Violation of Riparian Rights)

191.    Under O.C.G.A. § 44-8-1, a "landowner has no right to . . . use or adulterate [a stream] as to interfere with the enjoyment of it by the next owner."

192.    Under O.C.G.A. § 51-9-7, "the polluting [of a watercourse] so as to lessen its value to the owner of such land shall constitute a trespass upon the property."

193.    During each Defendant's operation and/or ownership of Leatherbrook Holsteins, each Defendant's acts and omissions alleged in the first three claims for relief so polluted and adulterated the waters at issue that flow into and/or through Local Farmer Plaintiffs' farms as to interfere with the use and enjoyment of these waters by Local Farmer Plaintiffs and lessen the value of them to Plaintiffs, in violation of O.C.G.A. §§ 44-8-1 and 51-9-7.

## SIXTH CLAIM FOR RELIEF
### (Trespass)

194.    During each Defendant's operation and/or ownership of Leatherbrook Holsteins, each Defendant's acts and omissions alleged in the first three claims for relief caused pollution of the waters at issue on Plaintiffs' farms.

195.    These discharges constitute trespasses to Local Farmer Plaintiffs' farms.

196.    Sometime around 2015, one or more Defendants ditched and/or destroyed wetlands adjacent to the farm of Plaintiff Mark L. Israel, which has caused and continues to cause repeated flooding of portions of his farm including portions near his residence.

197.    Additionally, sometime between 2016 and 2018, one or more Defendants trespassed upon the farm of Plaintiff Mary Beth Powell Rogers and dug part of a channel on her farm down to Muckalee Creek.

198.    Local Farmer Plaintiffs are entitled to damages for the trespasses to their farms and the diminution in value to their farms in amounts to be proven at trial.

## SEVENTH CLAIM FOR RELIEF
### (Nuisance)

199.    During each Defendant's operation and/or ownership of Leatherbrook Holsteins, each Defendant's acts and omissions alleged in the first three claims for relief caused pollution of the waters at issue on Local Farmer Plaintiffs' farms.

200.    During each Defendant's operation and/or ownership of Leatherbrook Holsteins, each Defendant's acts and omissions caused the emission of noxious malodors from Leatherbrook Holsteins onto Local Farmer Plaintiffs' farms.

201.    This pollution and noxious malodors have caused Local Farmer Plaintiffs hurt and inconvenience and damage to Plaintiffs' farms and constitute a nuisance.

202.    This pollution and noxious malodors have substantially and unreasonably interfered with Local Farmer Plaintiffs' use and enjoyment of their farms and constitute a nuisance.

203.    This pollution and noxious malodors result from the negligence, improper, and illegal operation of Leatherbrook Holsteins.

204.    Local Farmer Plaintiffs are entitled to damages for the hurt and inconvenience to them from the pollution and noxious malodors, in amounts to be determined by the enlightened conscience of a jury.

## EIGHTH CLAIM FOR RELIEF
### (Punitive Damages)

205.    In the past few years, Local Farmer Plaintiffs repeatedly notified Defendants of the discharges of pollutants, noxious malodors, and excess runoff/stormwater from Leatherbrook Holsteins during each Defendant's operation and/or ownership of Leatherbrook Holsteins.

206.    Despite each Defendant having this notice, each Defendant willfully and repeatedly failed to cease or ameliorate the repeated discharges of pollutants, noxious malodors,

and excess runoff and stormwater, and thereby acted with specific intent to cause harm to Local Farmer Plaintiffs and their farms.

207.    Each Defendant acted with conscious indifference to the consequences of, and specific intent to cause harm to Local Farmer Plaintiffs in, creating and then in repeatedly failing to correct the discharges of pollutants, noxious malodors, and excess runoff and stormwater from Leatherbrook Holsteins that have and continue to cause damage to Local Farmer Plaintiffs and their farms, authorizing a jury to award punitive damages under O.C.G.A. § 51-12-5.1.

### NINTH CLAIM FOR RELIEF
#### (Attorneys' Fees and Expenses of Litigation)

208.    Each Defendant knew about the pollution of the waters at issue and the emission of noxious malodors by Leatherbrook Holsteins during each Defendant's operation and/or ownership of Leatherbrook Holsteins.

209.    In the past few years, Local Farmer Plaintiffs repeatedly notified Defendants of the discharges of pollutants, noxious malodors, and runoff from Leatherbrook Holsteins.

210.    Despite each Defendant having this notice and/or knowledge, each Defendant willfully and repeatedly failed to cease or ameliorate the discharges of pollutants, noxious malodors, and/or excess stormwater and thereby intentionally trespassed upon Local Farmer Plaintiffs' farms and acted in bad faith, authorizing a jury to award attorneys' fees and expense of litigation under O.C.G.A. § 13-6-11.

211.    Each Defendant was stubbornly litigious and caused Local Farmer Plaintiffs unnecessary trouble and expense because there exists no bona fide controversy that each Defendant violated the CWA, the LAS General Permit, and/or Sodbuster and/or Swampbuster requirements, and polluted the waters at issue yet each Defendant refused to correct these violations before the case was filed, which authorizes a jury to award attorneys' fees and expenses of litigation under O.C.G.A. § 13-6-11.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for this Honorable Court to:

212.     Grant Plaintiffs a trial by jury on all their claims for relief;

213.     Enter judgment in favor of Plaintiffs and against Defendants on all their claims for relief;

214.     Declare under the Declaratory Judgment Act that Defendants are liable and/or derivatively liable for violations of §§ 301, 402, and 404 of the CWA;

215.     Impose civil penalties of $54,833 per violation of the CWA per Defendant per day under § 505(a) of the CWA;

216.     Issue a temporary and/or permanent injunction ordering Defendants to cease their violations of the CWA, including any more illegal and/or unpermitted discharges of pollutants, remove all dredged or fill material discharged into the waters of the United States at issue, restore and remediate the waters of the United States at issue, and immediately take all necessary steps to come into permanent and consistent compliance with the CWA;

217.     Award Plaintiffs reasonable attorneys' fees and expenses of litigation (including expert witness fees) under the CWA and/or O.C.G.A. § 13-6-11;

218.     Award Plaintiffs punitive and compensatory damages in amounts proven at trial and determined by the enlightened conscience of a jury;

219.     Enter an order stating that the Court shall maintain jurisdiction over this action until Defendants come into consistent and permanent compliance with the CWA and comply with every order of this Court in this action including any consent decree entered by this Court; and

220.     Grant Plaintiffs such other relief as this Court deems just and proper.

Respectfully submitted,

Date: **July 11, 2019**                  **/s/ Tyler J. Sniff**
                                        Donald D.J. Stack
                                        Georgia Bar No. 673735
                                        Tyler J. Sniff
                                        Georgia Bar No. 403125
                                        STACK & ASSOCIATES, P.C.
                                        260 Peachtree Street, Suite 1200
                                        Atlanta, Georgia 30303
                                        Telephone: (404) 525-9205
                                        Facsimile: (404) 522-0275
                                        Email: dstack@stack-envirolaw.com
                                        tsniff@stack-envirolaw.com

                                        *Lead Counsel for All Plaintiffs*

Date: **July 11, 2019**                  **/s/ R. Hutton Brown**
                                        R. Hutton Brown
                                        Georgia Bar No. 089280
                                        April S. Lipscomb
                                        Georgia Bar No. 884175
                                        SOUTHERN ENVIRONMENTAL LAW CENTER
                                        Ten 10th Street, NW, Suite 1050
                                        Atlanta, Georgia 30309
                                        Telephone: (404) 521-9900
                                        Facsimile: (404) 521-9909
                                        E-mail: hbrown@selcga.org
                                        alipscomb@selcga.org

                                        *Counsel for Plaintiff Flint Riverkeeper, Inc.*